Good morning, Rogers. May you please the court, I reserve three minutes for rebuttal. Okay. In this appeal, plaintiffs allege defendant's breach of fiduciary duty under arrest of two participants in a 401k plan sponsored by SalesForce. The district court's decision dismissing plaintiff's amended complaint must be reversed with two overarching reasons. First, the decision is inconsistent with the Supreme Court's decisions in Hughes v. Northwestern decided only a few weeks ago in Tibble v. Edison International, which was decided in 2015. Second, the decision is inconsistent with relevant Ninth Circuit precedent. First, with regard to Hughes v. Northwestern. As an initial matter, like the plaintiffs in Northwestern, the plaintiffs here allege that defendants failed to select cheaper versions of the same investment fund. This is also the same issue in Tibble v. Edison. Now, in Hughes, the court stated that each investment must be evaluated on its own merits, regardless of how many other investment options are available to participants. The Supreme Court stated, and I quote, the Seventh Circuit erred in relying on the participant's ultimate choice over their investments to excuse allegedly imprudent decisions by the respondents, which were the defendants in that case. In Hughes, the Supreme Court also stated that courts must evaluate allegations  in light of the principles set forth in Tibble v. Edison, the 2015 case, to determine whether plaintiffs have stated a plausible claim for relief. In Tibble, the Supreme Court stated that courts must apply trust law principles in determining whether a fiduciary has breached their fiduciary duties. Now, this case presents a classic example of fiduciaries that breached their fiduciary duties by failing to follow trust law principles. The amended complaint identifies at least three trust law principles that plaintiffs allege defendants violated. The first, a trustee must continually monitor investments selected by the trust to make sure they continue to be appropriate investments. Second, a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical, other than the lower cost to products the trustee has already selected. And the third principle is that to determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include, quote, return rates of one or more suitable common trust funds or suitable index mutual funds or market indexes. And that's a quote to the Restatement of Third of Trust at paragraph 110 of the complaint. Can you just focus in on the specific theories of wrongdoing that you've alleged here? Maybe let's start with the retail versus institutional class shares. Sure, Your Honor. And that is our primary claim in this case. Okay. So they say, first of all, I mean, there's some – I'm still confused as to what is the situation with the R – is it the R6 or R5 class? And they say that something was already being offered. I'm still confused about that. So there's a disagreement between whether the institutional – there's something called an institutional share class was the same as an R5 share class. In our complaint, we say that from at least the start of the class period in 2014 to 2017, the plan was in the institutional share class, and it could have been in the lower share class, either the R5 or the R6. What defendants say is that the institutional share class is the same as the R5 share class. So the only share class they could have gone into was the R6. And then what we say is that based on publicly available information, there's some sort of disconnect because it doesn't appear what they're seeing is true. But be that as it may, even if the institutional share class was the same as an R5, they don't deny that they could have moved to the R6 share class. The argument between us is that they believe that they didn't have an obligation to use a lower share class because they were deriving something called revenue share from the excess amounts. And our whole point of the – our whole claim is that it is improper to assess the extra cost of plan participants for many reasons. The first is you're depriving them of opportunity costs to use when you look at the excess amount of money they're paying. And they're only paying that extra amount not because they're getting another type of fund, because the defendants themselves have chosen to use – to take the excess funds to pay for record-keeping administrative expenses. At least that's what they say. But what we say is that from what we've planned, that the cost difference between the share classes amounted to about $10 million in damages during the class period. And that's a significant amount. And there's no indication that the amount of record-keeping or administrative costs equal even that amount of $10 million. Okay. And that is what we would need to know as a factual matter before we could just say, I guess kind of as a matter of law, that the fiduciaries acted prudently here. Is that the idea? Well, that's part of it because all that does is it is – it may affect how you – it may be a mitigation of damages. But for the court's purpose, for the trier of facts role here, would be after all the facts have been developed, they would need to – the defendants would have to understand what processes the defendants went through in order to determine that the higher cost share class was appropriate. What this district court got wrong was that it credited defendants' statement that everything was okay because they used the excess revenue share to pay for other costs. But almost universally, other courts have looked at this and said, well, that's something to determine after discovery because we don't know why they chose the higher cost share class and whether they actually made a prudent decision that it was appropriate. I think one – we cite many cases, including Davis v. Washington, which is the appellate court in the Eighth Circuit, which says – defendants have one explanation, but so do the plaintiffs, and we must draw all reasonable inferences in plaintiffs' favor. And if plaintiffs are correct, then it would be imprudent for a large retirement plan, which had the ability to get a lower share class, to have paid for a higher cost share class. And another court that I want to quote, because I think this hits the nail right on the head, says, the question is not whether a revenue-sharing model is within the range of reasonable choices a fiduciary might make, but whether his revenue-sharing agreement was reasonable under all the circumstances. But that determination must account for all the factors which informed a fiduciary's decision-making, not all of which are presently known to plaintiffs. And that's a quote from Trapp v. Oracle Corp., 2017, Westlaw 1100876, and asterisk 2, as from the District of Colorado in 2017. In this case, plaintiffs are at a disadvantage because we do not have access to the meeting minutes of the Investment Committee. We, in fact, did ask for the Investment Committee meeting minutes at the beginning of the case, but it was denied. This is prior to the eventual suit. But the Eighth Circuit has, in Braden v. Walmart, as well as all the courts since then, have said this is one of the reasons why you must locate facts plaintiffs plead favorably and infer through circumstantial evidence that what they've pled shows that defendants have failed to meet their prudent standards. And in this case, the one thing we did to try to show that there was circumstantial evidence that the defendants didn't follow a prudent process is, first of all, if you look at the cost differential between the lowest share class and the funds in the plan, the funds in the plan cost anywhere from 17% to 70% more than the identical funds they could have selected. So that's one clear indication that defendants may have not taken the best route in deciding what investments were prudent for the plan. Additionally, the lowest share class was our primary claim, but in order to show that this plan was not prudently managed, we listed out alternative methods in which they breached their fiduciary duties. One of the other ways was that we list that the defendants failed to consider the J.P. Morgan Target Date Blend Series, which was a combination of an actively managed fund and a passively managed fund, all offered by J.P. Morgan, which was the same company that also offered the other J.P. Morgan Target Date Funds that we take issue with. The purpose of us making this allegation that they failed to consider a passively managed blend by J.P. Morgan is that the cost structure of this other potential fund was much lower in terms of cost to plan participants. So that's another indication that there was another fund that was easily available to the defendants that didn't select. And our allegations is based solely on trust law because trust law says, as I mentioned before, trust law says an appropriate comparator for funding the plan may include an index fund. And here we show a hybrid passively managed versus actively managed fund. Can I ask counsel a procedural question? Of course, Your Honor. The opposing party filed a Motion 12B6, 12B5, Motion to Dismiss, and the court granted that motion but gave you an opportunity to amend your complaint, which you did, and then, pursuant to a second Rule 12 Motion to Dismiss, granted the motion but did not give you an opportunity to file a second amended complaint. Would you have done that, and what would you have alleged differently in a second amended complaint? I think, Your Honor, we wouldn't have amended because in light of the Supreme Court's Northwestern decision, our complaint essentially lays out how the defendants did not follow trust law principles. So although I didn't have knowledge of the Supreme Court's decision prior to us amending the complaint, now that I do have knowledge of the Supreme Court's decision, our second amended complaint lines up perfectly with that. So in terms of the broad picture, other than immaterial allegations shown there, there is nothing to amend from the broad picture for my second amended complaint. Well, with that statement, can I ask you just one question about your first amended complaint? Of course, Your Honor. In paragraph 130, this was a rather lengthy complaint, which I guess is the result of our forensic ball and twombly, right? That's correct, Your Honor. You got a plausible claim. So 130 seems to be your key paragraph where you allege the essence of how they violated their duty of prudence, right? It says they did not make decisions regarding the plan's investment lineup based solely on the merits of each investment and what was in the best interest of the plan, I mean of the participants, plan participants. That's correct, Your Honor. Okay. So was there a particular point in time when they violated their duty of prudence? Well, yeah, Your Honor, that's a very good question. So under the typical decision by the Supreme Court, the defendants have to continually evaluate the prudence of each investment in the plan. But at the start of the class period, the proper investments were not in the plan. So from 2014 to arguably 2019, when they replaced the funds that were challenged in the plan with low-cost collective trust funds, we would argue during that entire period there was a violation one way or the other of their fiduciary duties. Okay. You are just about out of time. Do you want to save the balance for rebuttal? Yes, Your Honor. Okay. Very good. Let's hear from counsel for the appellees now. Thank you, Your Honor. May it please the Court. I'm Eric Cerrone of Steptoe & Johnson, and I represent the Salesforce defendants. This case is based entirely on hindsight. The district court's dismissal is supported not only by this court's precedents, in particular the court's unpublished decision in White v. Chevron, along with the court's decision in NRA Century Aluminum Company securities litigation. It's also supported by the Supreme Court's recent decision in Hughes. Hughes confirms that claims of this nature must be tested under the Twombly and Iqbal pleading standards and that hindsight allegations are not enough to state an actionable claim. The plaintiffs in Hughes had alleged that the university breached ERISA's duty of prudence by paying excessive fees to the plan's record keepers under a revenue-sharing arrangement and by offering a number of options that were too expensive and underperformed. The Seventh Circuit rejected the investment challenges, reasoning that the university had provided a diverse menu of options, which included the type of low-cost index funds that the plaintiffs preferred, thus eliminating any concerns that other investment options were imprudent. Can I just interrupt you there? Yes, John. Just let's focus on the institutional versus retail class shares issue. That's the, as you heard your opponent say, kind of the heart of their case. Yeah. So let me just lay out, I guess, my thinking on that, and then you can tell me why I'm wrong because I'm not inclined to think that the district court did this right. Sure, sure. Their allegation is that essentially the same, almost the identical investments could have been offered to plan participants at a substantially lower cost, and they lay out the cost differential to the tune, as he said, of about $10 million over the period they're focused on. Right. If that were true, right, if you really could capture the same investment returns just by shifting to this different class of shares, and, you know, they were substantially less expensive to the participants. I mean, our decision in Tybill from before the Supreme Court reviewed it and other circuits' decisions show that that is definitely a viable theory. What you come back and say is that on a motion to dismiss, we're supposed to take judicial notice of this document that says, well, but there was a revenue sharing component involved in the, I can't remember which, the retail class shares, I guess, and that's enough of a difference for them to have to come back and essentially with no discovery rebut this alternative explanation, I guess. That's why you were alluding to the Century Aluminum case, and I just don't see how that could possibly be correct on a motion to dismiss.  Let me start with the fact that they don't even claim that we had retail shares. Okay. This plan had institutional shares. The big difference between retail and institutional is retail classes typically charge 12B1 fees. They have lower investment minimums. These classes didn't have 12B1 fees. They didn't have, they had a much higher investment minimum of a million dollars. If you look at their complaint, their original complaint, they actually say this claim is not about the use of retail mutual funds versus the use of institutional mutual funds. Is that in the? That's their original complaint. It's paragraph 88. Is that in their amended complaint? No. They dropped that in, but they don't allege, they allege in their amendment. Why aren't we talking about something that's? Well, it's important because I think it undergirds what the nature of their claim is, Your Honor, and if you look at the amended complaint, what you see is an allegation in the amended complaint. In fact, the term retail doesn't appear anywhere in the amended complaint. They don't say that these are retail shares. In fact, what they say, they call it repeatedly institutional shares. Let's not play word games. I haven't responded entirely. Let's not play word games. Forget about retail versus institutional. What they do allege is that the identical, essentially the identical investment, you could have shifted over to this much lower cost thing that would have generated the same basic returns. So just forget about the label. Correct. If they prove that, if they were able to prove that, your clients, I think, would probably be liable. So just talk about the alternative explanation of why you think Century Aluminum governs, because I just don't see how it does. Because it is widely known in this industry that different share classes may provide different levels of revenue sharing. It's also something that they could have discovered. I mean, this is like a shoot first, ask questions later complaint. I mean, they could have done a little bit of research on what an R6 share class is. They are designated R6 because they are non-revenue sharing share classes. They don't offer revenue sharing. The other share classes do. And so unless what you're going to do is just hold that it's impermissible to use a revenue sharing arrangement to pay plan administration costs, which, by the way, no court has ever held, then you have to recognize that that is a permissible way of doing things. Now, what we did was we filed a motion to take judicial notice of Form 5500s, and in particular a Schedule C that was cited, by the way, throughout their complaint. In fact, they cited the Schedule C in one of their allegations to identify Fidelity as the record keeper. Well, if you look at those very same pages, and we put in the Schedule Cs going back to 2012, what you see is what those Schedule Cs disclose is direct and indirect compensation that's paid to the record keeper. But, Counselor, I looked at those, but they don't tell us what the magnitude of those costs are. Well, the magnitude is perfectly determinable within a range because it shows you in Item 3 what percentage, how many basis points each fund was paying to Fidelity. You could then take that by the balance that's shown in each fund, which you see at the end of the financial statements. Each fund will show a balance invested in that fund. You just multiply .15 percent times the balance, you get an approximate amount of revenue sharing that was going to Fidelity. And that was compensation that Fidelity was getting for its record keeping services. The judge looked at that. The judge concluded that, indeed, this was a revenue sharing arrangement, and that that was a plausible explanation for the higher fee share class. Now, if you're going to, their theory in this case, and you just heard him say it, was they're just saying that you can't use revenue sharing as an explanation for higher fee share classes. That's just a formal assault on the entire practice. I don't know that he's saying you can't. It's that on this record, we don't have the ability, I mean, I don't know if this is the right way to look at it, but he's saying that essentially the planned participants lost upwards of $10 million paying higher expense ratio. We don't know, unless you're going to tell us that it's in the documents, whether the record keeping fees were of a similar magnitude, right? That's what we would need to have some sense of to know whether it was prudent to have this. I mean, he could throw any number he wants in his complaint. But, you know, there are some problems with how he's done that. But let me go back for a second. The district court did take judicial notice of it. It was not objected to. And to this day, they have not argued that there was a revenue sharing stream of 15 basis points coming out of these investments. There's no dispute about that here. They're just saying that there was too much revenue sharing. But, Your Honor, one other thing to point out here is that this is not like the Suita case. It's not like the Hughes case. It's not like Davis. It's not like, I'm trying to think of the other court of appeals decision, Sasserdote. All those were challenges to university health plans where they alleged more than just that they were in retail share classes, which I said before we were not. They alleged more than that. They alleged that the amount of revenue sharing coming out of the funds was excessive, that there was too much revenue sharing in the aggregate, and that the plan's administrative expenses were too high. They don't have any of those allegations here. They haven't alleged that the administrative expenses were too high. They haven't alleged that the amount of revenue sharing was excessive, that nobody was monitoring the amount of revenue sharing. Their complaint is a frontal attack on the use of revenue sharing to defray plan administration costs. And if that kind of complaint is allowed to stand, it's going to be open season against the fiduciaries of these plans. I'm sorry to be a little bit dense. Go ahead. Okay. I'm just not, I don't think I'm quite following you. I'm sorry. Okay. I'm just going to make up some hypothetical numbers. You know, counsel, just observing the physicality between you and my colleague. Yes. You would stand well to listen to the complete question and absorb it before answering. My apologies, Your Honor. Go ahead. Thank you. Okay. So let's say that their allegation is that, I don't know, you threw out basis points, that the institutional, let's not even play. The lower cost class of shares, you know, would have saved on the order of 50 basis points, right, for the plan participants. And then you come in and say, well, but we were paying, you know, these record keeping fees of 15 basis points. And that's why, you know, we went with this other seemingly more expensive class of shares. I guess on those numbers, it just doesn't seem to me that you just win automatically, because there's still a differential that somebody could say, well, wait a minute. Why were you making the plan participants pay 50 basis points more when the only revenue sharing component of it amounted to 15 basis points? It seems like there would still be a problem that would need to be sorted out at the summary judgment stage. So why are we able to do that at the motion to dismiss stage? Because, Your Honor, all I can move on a motion to dismiss is what the complaint alleges. What you've just suggested is not in the complaint. That's not what the complaint alleges. There's no allegation that there's too much revenue sharing. Okay, sorry to cut you off. Yeah. They do allege the first part, right, that I don't know if it's 50 basis points, but it's some spread. And all I'm saying is that we don't know, do we, what the magnitude of the spread is on the record keeping fees side. Well, you know that you have 15 basis points coming out of these funds, and you know the differential between the expense ratio for the R6 and the R5 share class. And, in fact, the differential between the R5 and the R6 share class is such that it's a net, that the net value of the R5 class is higher to the plan, because the spread between the R6 and the R5 in their expense ratio is roughly, it's alleged in their complaint, is maybe, you know, 8 to 11 basis points. But if you get the R5 class, it's like getting a rebate. You get a rebate of 15 basis points, which drops the net, it's a better net value than the R6. And that's not a fact question. It's in the, you can see that from the complaint. No, I'm asking, and that's not a fact question according to your position. I mean, it's math based on, you know, the difference in the expense ratios and what is being paid in revenue sharing. I don't know that there's a fact issue there. And I will add, Your Honor, that there are cases that. What are all those facts alleged in the complaint? Well, the facts alleged in the complaint. The First Amendment. Yeah. I mean, the First Amendment complaint alleges what the expense ratio of the R6 class was. It alleges what the expense ratio of the R5 class was. And so you can see the differential right in the complaint allegations. And, you know, the spread, as I said, if you just subtract one from the other, it's going to be somewhere between 7 or 8, 9, 10, 11 basis points. But it's less than the revenue sharing that's getting spun off by the R5 share class. And I was going to add, Your Honor, that there are cases out there where fiduciaries are sued for not taking the higher fee share class because the net value to the plan is greater. That's exactly the situation you have here. And, again, and by the way, you did raise, I think, another question that I didn't respond to, which had to do with arguing about the iShare class and the R5. This is not something that discovery leads anywhere on. This is stuff, this is, like I said, they shoot first and ask questions later. You can go to SEC filings and find out exactly what share class was what. You can look at the ticker symbols. Each mutual fund share class has a ticker symbol. If you put in, if you do a search for the select class of this fund, and, in fact, we've got one of the documents that is a prospectus that the district court took judicial notice of, is a prospectus that shows you the ticker symbols for the select and the institutional class. If you put those ticker symbols in the internet, on Google, the select class ticker symbol will give you the I class. If you put the ticker for the institutional, it will give you the R5. What happened was the names of those two series, select and institutional, were changed. That's also, you know, publicly available information in SEC filings, effective April 3, 2017. So anyone who held select became a holder of I. Anyone who held institutional became a holder of R5. Their math on 10 million is based on a fallacious assumption that we were in the select class, and there's no allegation or complaint that we were. They don't say, you don't see the word select anywhere. Again, shoot first and ask questions, do the research later. Okay. You are just about out of time. Do you have a concluding thought to leave us with? I think I've used up the time in responding to your questions. Again, I would just say that if the complaint allegations in this case are enough to get past the motion to dismiss, it's going to be open season for fiduciaries of participant-directed plans. Okay. Thank you. Thank you very much. If you could just put a minute on for rebuttal.  Okay. Please. Great. Thank you, Your Honor. With respect to the open season on fiduciary plans, I think that is a big grandstanding because it's just not us that have made allegations like this. We cite a couple of cases that have made allegations similar to this. And putting aside labels as to whether it's institutional or R5 class, our $10 million damages is based on the discrepancy between the expense ratios of whatever investment was in the plan versus the lower shares of the club. Can you respond to your opponent's argument that if we just do the math, we can figure out ourselves that actually there was a net benefit to the planned participants by virtue of this record, the revenue sharing component? Well, I think if we could do the math, they would have done the math and put it in their opposition. It's not as clear cut as that because they don't say where all the revenue sharing went to. But if it could have gone to, they say it went to record keeping and administration. However, sometimes the excess is kept in a sort of a rest of fund to be used later or not even be made to the participants. So I'm not sure there's a way to do a clear math on that. Excuse me, did they make, your opponent make in their second motion to dismiss, the do the math allegation? I believe there was, they did, but they didn't actually give the raw numbers. And did you respond to that? In our reply, I believe we did. If we didn't, the answer to that is that this is two matters here, liability versus damages. If you do the math and it comes out to be less, then they mitigate damages. We don't have any damages, which is clearly not what we're saying. But in terms of liability, the question is whether they took the steps and they went through the correct process to make the determination that they should, at the first instance, charge the plan participants more money than they needed to in order to quote-unquote benefit them. That's a liability question, and the math doesn't, the math is only, it goes toward mitigating what the damages are. Because, Your Honor, you have to remember there's also a loss of opportunity cost, money that was taken out of the plan participants' pockets that could have been invested elsewhere. Instead of it being, you know, if they were charged a lower fee to begin with, then the $10 million, so to speak, stays in their pocket, and they could use it to do other investments. And then they could be charged directly for recordkeeping and administration costs later, which they could pay for. But as far as the damages, as far as this case, what they did do, what we know is they took the money out first at the tune of $10 million. Okay. All right. Thank you, counsel. The case just argued is submitted.
judges: HAWKINS, PAEZ, WATFORD